UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

NRAD MEDICAL ASSOCIATES, P.C.,

Chapter 11

Case No. 15-_____ (____)

Debtor.

-------------------------------------------------------------x

**DECLARATION OF NAT WASSERSTEIN UNDER
LOCAL RULE 1007-4 IN CONNECTION WITH CHAPTER 11 FILING,
AND LOCAL RULE 9077-1 IN SUPPORT OF CERTAIN "FIRST DAY" MOTIONS**

Nat Wasserstein declares pursuant to 28 U.S.C. § 1746 as follows:

**BACKGROUND**

1.      On July 6, 2015 (the "**Petition Date**"), NRAD Medical Associates, P.C. (the "**Debtor**"), filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "**Bankruptcy Code**") in this Court.  The Debtor is authorized to continue to operate and manage its business and property as a debtor in possession under Bankruptcy Code §§ 1107(a) and 1108.

2.      I am the Managing Member of Lindenwood Associates, LLC, and serve as the Debtor's Chief Restructuring Consultant pursuant to a Shareholders' Resolution dated as of June 23, 2015, and filed with the Court (ECF Doc. No. 3).  I was initially retained by the Debtor on or about January 20, 2015 to assist the Debtor in its efforts to restructure its business operations and either consummate an alignment transaction, or sell certain assets in order to maintain value as a going concern.

**Nature of Debtor's Business Generally**

3.      Until June 1, 2015, the Debtor operated a regional radiology imaging medical practice (the "**Imaging Practice**") and a regional radiation therapy practice (the "**RT Practice**") with sixteen (16) locations throughout Long Island and Queens, New York, which employed approximately 450 individuals.  In addition, the Debtor and certain multi-specialty practitioners

(*e.g.* gynecologists, internists, surgeons) (collectively, the "**MSP's**") were parties to agreements (collectively, the "**MSP Agreements**"), pursuant to which the MSP's were employed by the Debtor, certain assets were acquired, certain obligations were assumed, and the Debtor fulfilled the imaging needs of the MSP's practice (the "**MSP Practice**").

4.      Over the last few years the RT Practice and MSP Practice became a financial burden that, when coupled with unfortunate circumstances including, but not limited to a loss of referrals, and reduced reimbursement rates from insurance companies and third-party payors, created a downward financial spiral that the Debtor could not overcome under its former corporate structure.  The Debtor's financial issues were further exacerbated by the Debtor's legacy debt to former shareholders who redeemed their shares and terminated their employment agreements when the Debtor's financial problems arose. The departure of eighteen (18) shareholders within two years gave rise to increased debt in the form of redemption payments and severance obligations, while at the same time removing the revenue that such former shareholders may have generated.

5.      The Debtor operates its principal place of business from a leased space in Garden City, New York.  The Debtor continues to collect its accounts receivable for the benefit of its creditors, and is in the process of winding down its RT Practice and MSP Practice.

6.      The Debtor currently employs a total of 104 people, of which 75 individuals provide services to the RT Practice and MSP Practice.  The RT Practice currently operates out of three (3) sites in Garden City, New York, Woodbury, New York, and Lake Success, New York.  As of the Petition Date, there are seven (7) MSP Agreements in effect.[1]

7.      As set forth in greater detail below, I am informed by the RT Practice physicians that the Debtor cannot shutdown operations of its RT Practice overnight because the equipment is calibrated to treat individual cancer patients who must complete their current

---

[1] The physicians that remain parties to MSP Agreements with the Debtor as of the Petition Date are as follows: Dr. Mancuso; Dr. Palleschi; Dr. Smith; Drs. Fontanetta, Michaels, and Langan; Dr. Kaufman; Dr. Maurer; and Dr. Logman.

treatment regimens.  Accordingly, the Debtor is in the process of winding down its RT Practice, and expects that the process will be completed by late August 2015.

8.    The Debtor similarly cannot immediately unwind the various remaining MSP Agreements because the Debtor was either contractually obligated to provide those physicians with notice within which time those MSP Practice physicians may align with a new entity, or the Debtor was prohibited from doing so under the applicable MSP Agreement.  The MSP Practice operates from the offices of each applicable physician.  The Debtor provided notice to the remaining MSP Practice physicians prior to the Petition Date, and expects that all remaining MSP Agreements will be unwound as of September 1, 2015.  As a result, the Debtor will have no further obligations to those parties.

**The Alignment Transaction**

9.    The Debtor explored various options to utilize its assets and to align its Imaging Practice with a party willing to make a long term commitment because the Debtor has real property leases and equipment leases to maintain.

10.    On June 1, 2015, following notice to and consent of Sterling National Bank ("**Sterling**") the Debtor closed an alignment transaction (the "**Alignment Transaction**") pursuant to which the Debtor transferred substantially all of the assets of its Imaging Practice, subject to Sterling's lien, the Shareholders' Lien (defined below), and the Vincoff Lien (defined below), to Blue Dot Holdings, LLC ("**Blue Dot**"), a wholly owned subsidiary of the Debtor. Blue Dot in turn transferred those assets to Meridian Imaging Group, LLC ("**Meridian**"), a newly formed management services organization ("**MSO**"), in exchange for an ownership interest in Meridian, pursuant to a certain Contribution Agreement effective as of June 1, 2015, by and between Blue Dot and Affiliated Imaging Group, LLC ("**Affiliated**").

11.    Affiliated is an unrelated MSO which provided management services to radiologic imaging practices pursuant to a pre-existing licensing agreement with NYU (defined below). Affiliated simultaneously transferred substantially all of its assets to Meridian in exchange for

an ownership interest in Meridian.

12.    Upon the effectiveness of the Contribution Agreement and the agreements entered into as of even date therewith, Blue Dot has a 52.8875% ownership interest in Meridian, and Affiliated has a 47.1125% ownership interest in Meridian.  Meridian licensed those transferred assets and certain leasehold interests, and provides certain services to New York University School of Medicine, an administrative unit of New York University, a New York education corporation ("**NYU**") in exchange for, among other things, a usage fee, pursuant to an Exclusive License Agreement (the "**License Agreement**") by and between Meridian and NYU effective as of June 1, 2015.

13.    Pursuant to the License Agreement, Meridian licenses to NYU certain leasehold interests previously owned by the Debtor and/or Affiliated, furnishes to NYU the services of nurses, certain non-physician and clerical personnel, and provides clinical services and radiology services to patients at those leasehold locations.

14.    In addition, Meridian executed a Promissory Note in favor of Blue Dot for the amount of $600,000 to be paid with interest over four (4) years, and granted Blue Dot a security interest in certain equipment previously transferred from NRAD to Blue Dot, and then in turn from Blue Dot to Meridian pursuant to a Secured Promissory Note dated July 2, 2015. As a result, Sterling assigned to Blue Dot its interest in the UCC-1 financing statement attached to that collateral.  Blue Dot subsequently assigned its interest in that Secured Promissory Note to the Debtor, and provided Meridian with a direction letter to make all payments due under that note to the Debtor.

**The Debtor's Post Alignment Transaction Obligations**

15.    In addition to the employees discussed above, the Debtor employs eleven (11) cardiologists,[2] and seven (7) nurses, all of whom provide services to NYU's radiology imaging

---

[2] One of the cardiologists is a W-2 employee, but the remaining are independent contractors.  The Debtor is a party to a contract with each of the cardiologists.

SPG/1762220.5/063017

patients as part of the Alignment Transaction.  The Debtor continues to employ those individuals because Meridian is an MSO and, according to the Debtor's professionals, an MSO cannot employ those professionals.  As a result, the Debtor is a party to a contract with NYU to provide the cardiologists' services, for which NYU will reimburse the Debtor to pay the cardiologists' fees.  The Debtor employs nurses to fulfill Meridian's obligation to provide nursing services to NYU's patients.  NYU pays Meridian for those services, and Meridian remits those funds to the Debtor to pay the nurses.  The Debtor will only continue to employ those individuals for a short period of time until a new professional corporation is formed to employ those individuals, or those individuals are hired by a professional corporation associated with Affiliated.  To that end, Debtor expects, through this chapter 11 case, to either assume and assign those contracts to a newly formed professional corporation, or reject those contracts so that NYU and a newly formed corporation can negotiate new contracts.

16.    Also as part of the Alignment Transaction, the Debtor agreed to contribute its leasehold interests for the practice sites of its Imaging Practice, subject to the applicable landlords' consent, which leasehold interests would then be licensed to NYU.  As of the Petition Date, four (4) of the sites for the Imaging Practice were successfully assigned and contributed.[3]  The Debtor intends, through this chapter 11 case, to assume and assign the remaining leasehold interests as required by the Alignment Transaction.

**The Debtor's Current Shareholders**

17.    The Debtor is owned by eight (8) shareholders (collectively, the "**Current Shareholders**") as follows: Robert V. Blake, M.D.; Paul D. Cayea, M.D.; Paul S. Lang, M.D.;

---

[3] The Debtor also agreed to contribute its leasehold interest for its principal place of business to Meridian, at which administrative activities occur.  The location of the Debtor's principal place of business is 990 Stewart Avenue, 4th Floor, Garden City, New York 11530.  The location of the Debtor's Imaging Practice site which was successfully assigned prior to the Petition Date is: 6 Ohio Drive, Suites 104, 101, 102, and 205, Lake Success, New York.   The location of the Debtor's Imaging Practice sites which have not yet been assigned as part of the Alignment Transaction are: 625 Locust Street, Garden City, New York (used only for records retention); 80-15 164th Street, Jamaica Estates, New York; 410 Lakeville Road, Suites 301B and 301C, Lake Success, New York; 765 Stewart Avenue, 2nd and 3rd Floors, Garden City, New York; and 105 Froehlich Farm Boulevard, Woodbury, New York.

Robin Ehrenpreis, M.D.; Daniel Benjamin, M.D.; Gene Berkovich, M.D.; Eric Schnipper, M.D.; and Paul Schorr, M.D. The Current Shareholders are not equal owners, but rather own either a full share or some percentage of a share. Drs. Lang, Benjamin, and Ehrenpreis are members of the Debtor's Board of Directors (the "**Board**").

18. The Shareholders are parties to the Fourth Amended and Restated Shareholders' Agreement, dated as of January 1, 2010 (as amended, the "**Shareholders' Agreement**"). Upon joining the Debtor, each shareholder entered into employment agreements which provide that the shareholder is entitled to severance payments upon termination of employment with the Debtor.

**Sterling National Bank Debt**

19. On or about September 11, 2013, the Debtor entered into a term loan with Sterling National Bank ("**Sterling**") for the amount of approximately $1.7 million (the "**Sterling 2013 Term Loan**") pursuant to a promissory note. That promissory note was secured by the cash surrender value of certain life insurance policies, the proceeds of which were used to satisfy a portion of secured debt due to Signature Bank then in default.[4]

20. On December 27, 2013, the Debtor entered into a revolving credit facility with Sterling (the "**Sterling 2013 Credit Facility**") for a maximum borrowing amount of $5,811,500, secured by a first priority lien on substantially all of the Debtor's assets,[5] pursuant to a Loan and Security Agreement, the proceeds of which were used in part to satisfy the remaining secured debt due to Signature Bank.

---

[4] In or about 2012, the Debtor was a party to a revolving credit commitment with Signature Bank with a maximum borrowing amount of approximately $5.3 million. There were no personal guarantees required for the Signature Bank debt. In or about December 2013, Signature Bank notified the Debtor that it was in default, and began charging an eighteen (18%) percent default rate on the debt. Shortly thereafter, Signature Bank commenced an action against the Debtor in the Supreme Court of New York, County of Nassau, Index No. 601744/13.

[5] Sterling holds a subordinate lien on those assets that serve as collateral for the Current Shareholders' first priority lien. As stated below, the Debtor granted the Current Shareholders a first-priority lien on certain assets in exchange for the Shareholders' Additional Collateral (defined below) provided by the Current Shareholders to Sterling.

SPG/1762220.5/063017

21.    The Sterling 2013 Term Loan and the Sterling 2013 Credit Facility were further secured by $2 million of cash and securities pledged by the Current Shareholders (the "**Shareholders' Additional Collateral**"), to be returned upon the Debtor's ability to reach certain financial ratios under the loan documents.   In exchange, the Debtor granted the Current Shareholders a first-priority lien (the "**Shareholders' Lien**") upon certain equipment up to a value of $2 million, pursuant to a Security Agreement dated as of December 27, 2013 (the "**Shareholders' Security Agreement**").    The Current Shareholders filed a UCC-1 financing statement against the Debtor to perfect their interest.

22.    The Current Shareholders further committed themselves to the future of the Debtor by executing personal guarantees (the "**Shareholder Personal Guaranties**") in favor of Sterling in connection with the Sterling 2013 Term Loan and the Sterling 2013 Credit Facility.

23.    In or about January 2015, the Debtor and Sterling entered into an Amendment to Loan and Security Agreement (the "**Sterling Amendment**"), pursuant to which Sterling required that the Debtor refinance $1,997,000 of the maximum facility amount of the Sterling 2013 Credit Facility on or before February 27, 2015.

24.    Sterling's request for the Sterling Amendment was in response to the Debtor's non-monetary default under the Sterling 2013 Credit Facility, including failure to be in compliance with certain financial covenants including, but not limited to, the debt service coverage ratio and net loss for the fiscal year ending December 31, 2013, and the fiscal period ending September 30, 2014.

25.    The Debtor's inability to satisfy certain financial covenants was caused, at least in part, by the failure of CBIZ Medical Management Professionals, Inc. ("**MMP**"), the Debtor's third party billing agent, to adequately perform billing services on behalf of the Debtor.   MMP allowed the Debtor's accounts receivable over 120 days to exceed 18% of total accounts receivable, when the maximum percentage allowed under an Agreement with MMP was 12%.

As a result of MMP's inadequate services, approximately $4 million of the Debtor's receivables were not eligible to be considered in the calculation of maximum borrowing availability under the Sterling 2013 Credit Facility.

26.    Between February and June 2015, Sterling cooperated with the Debtor to extend the deadline by which the Debtor was required to refinance a portion of the Sterling 2013 Credit Facility.  During that time, the Debtor explored various alternative financing alternatives through a broker which were not successful.

27.    In May 2015, Sterling consented to the Alignment Transaction.    Shortly thereafter, the Debtor restructured the Sterling 2013 Credit Facility and Sterling 2013 Term Loan into two (2) term loans (the "**Sterling Term Loans**") by and among Sterling, as lender, and NRAD, Blue Dot, and Red Dot Holdings, LLC[6], as borrowers.  "Term Loan 1" is in the amount of $3,688,500, and refinanced the Sterling 2013 Term Loan and a portion of the Sterling 2013 Credit Facility.  "Term Loan 2" is in the amount of $3,053,365, and refinanced a portion of the Sterling 2013 Credit Facility. The Sterling Term Loans both mature in four (4) years, and are secured by a lien on: (i) substantially all of the Debtor's assets; (ii) the Shareholders' Additional Collateral;[7] (iii) Blue Dot's membership interest in Meridian; (iv) the income stream due from Meridian to Blue Dot and (v) the products and proceeds thereof.

28.    As part of the consideration for the Sterling Term Loans, the Current Shareholders executed Certifications agreeing to reaffirm the Shareholder Personal Guaranties and pledge and/or control agreements with respect to the Shareholders' Additional Collateral.

29.    In addition, the Debtor was obligated to pay down $1,000,000 of principal of Term Loan 2 from the collection of pre Alignment Transaction receivables as follows: (i)

---

[6] Red Dot Holdings, LLC was formed in the event that the Debtor was able to negotiate an alignment transaction between NYU and the Debtor's RT Practice.  Those negotiations were unsuccessful.

[7] As a direct result of the Debtor's financial status leading up to the Alignment Transaction, Sterling has not returned any of the Shareholders' Additional Collateral.

    SPG/1762220.5/063017

$150,000 in June 2015; (ii) $400,000 no later than July 2, 2015; (iii) $50,000 no later than September 1, 2015; and (iv) $400,000 no later than December 31, 2015.  As of the Petition Date, the Debtor has paid approximately $550,000 of that amount.

30.    As of the Petition Date, the Debtor was indebted to Sterling in the amount of $6,741,365 (the "**Sterling Debt**").

31.    In connection with the filing of the Debtor's case, the Debtor has filed a motion seeking authority to use Sterling's cash collateral during the pendency of the case.  As set forth below, I believe there are strong and cogent reasons why the Court should grant the Debtor's motion.

**The Debtor's Liabilities and Assets**

32.    As of June 5, 2015, the Debtor, on an unaudited basis, had total assets of approximately $25.04 million, plus its interest in Blue Dot as well as the income stream due to Blue Dot from Meridian.  Its total liabilities, including secured debt to Sterling is approximately $23.43 million.

33.    The Debtor's gross revenue in 2012 was approximately $93.5 million.   The Debtor's gross revenue decreased in 2013 to $88.4 million, and decreased in 2014 to $66.69 million.

34.    The Debtor's largest secured creditors include: (i) Sterling on account of the Sterling Debt in the amount of approximately $6.7 million, which maintains a first priority lien on substantially all of the Debtor's assets, except certain of the Debtor's equipment, on which the Current Shareholders hold a first priority lien; (ii) the Current Shareholders who maintain a first priority lien on certain equipment with a value of not more than $2 million; and (iii) Nina S. Vincoff, M.D. who as of the Petition Date maintains a junior subordinate lien on substantially all of the Debtor's assets.[8]

---

[8] As set forth below, the Debtor intends to file the Vincoff Adversary Proceeding (defined below) to avoid, among other things, the Vincoff Lien (defined below) as a preferential transfer.

SPG/1762220.5/063017

**Events Leading to the Alignment Transaction**

35.    Negotiations with respect to the terms of the Alignment Transaction lasted nearly six (6) months, but the end result allowed the Debtor to save approximately 400 jobs, and created a revenue stream to address its liabilities.

36.    The Debtor consummated the Alignment Transaction after attempting to negotiate alignments, mergers, buy-outs, and other solutions to its financial crises.  The Current Shareholders believe that the Alignment Transaction was in the best interests of the Debtor, its creditors, and its employees.  Indeed, the Alignment Transaction provides employment for 400 physician and non-physician employees previously employed by the Debtor, preserves value for the Debtor's estate, and creates a revenue stream so that the Debtor can satisfy its liabilities under a plan of reorganization.

37.    Closing the Alignment Transaction was necessary, and in the best interest of the Debtor, its creditors, and its estate.  The Debtor's accounts receivable and revenue were steadily declining as its liabilities were increasing.  Due to the nature of the practice, its expense reducing measures were unsuccessful in offsetting the escalating losses.  In or about 2013, the Debtor's RT Practice and MSP Practice continued to sustain losses.  The Former Shareholders abandoned the Debtor in the midst of its financial crisis, which caused the Debtor to incur redemption liabilities of approximately $2 million per year for a five (5) year period.  Furthermore, the Debtor was a party to multiple litigations, including a judgment obtained by one of the Former Shareholders, which made it impossible for the Debtor to solve its financial problems by simply downsizing its Imaging Practice.

**The Debtor's Declining Accounts Receivable and Revenue**

38.    The Debtor's main source of revenue was patient fees.  According to the Debtor's December 31, 2013 draft Audited Financial Statements, the Debtor's gross revenue

in 2013 was approximately $88.4 million, down from $93.5 million in 2012.  As of December 31, 2014, the Debtor's gross revenue further declined to approximately $66.9 million.

39.    The Debtor's revenue steadily declined since 2012 because of the decrease in the number of patients referred,[9] and because of the decrease in the reimbursement rates paid from third party payers such as private insurance companies, managed care organizations, and government sponsored programs.  Patient fees are reported in the Debtor's audited financial statements at the estimated amounts deemed collectible, which are less than the Debtor's established billing rates.

40.    As of December 31, 2013, substantially all receivables for patient care were from government payers, insurance companies and managed care organizations, as opposed to self-paying patients.

41.    In addition, and as stated above, the Debtor suffered serious cash flow issues because it was unable to realize all of the revenue it expected to collect due to the failure of its third-party collection agent, MMP, to satisfy its obligations under the agreement.[10]

### The Debtor's Liabilities and Expense Reducing Measures

42.    Pursuant to the Debtor's books and records, the Debtor's total expenses were significantly reduced from 2012 to 2013.  That decrease in expenses can be explained as follows: (a) between 2012 and 2013, the Debtor reduced employee salary expense from approximately $9 million to $8.4 million; (b) in 2013 the Debtor reduced its advertising expense from approximately $155,000 to approximately $54,000, closed one of its larger locations in Nassau County, and reduced shareholder salaries from approximately $14.2 million in 2012, to approximately $8.7 million; and (c) in 2014, the Debtor changed its

---

[9] The Debtor noticed that since 2012, hospitals and multi-specialty practices increasingly solicit employment with former community physicians whom the Debtor depended upon for its referrals, resulting in a decline in volume for the Debtor's practice.

[10] On May 13, 2015, the Debtor entered into a Termination Agreement with MMP pursuant to which the initial agreement with MMP was deemed terminated as of May 31, 2015, and MMP agreed to provide services for one hundred twenty (120) days.

SPG/1762220.5/063017

malpractice liability carrier, effectuated staff layoffs, and terminated agreements with certain MSP's that were not profitable.  Notwithstanding the Debtor's extreme cost-cutting measures, the Debtor was unable to offset the drastic drop in revenue.

### The Debtor's Continued Losses

43.    The Debtor maintains its books on a cash or "book" value basis.

44.    Although the Debtor's December 31, 2013 draft Audited Financial Statements reflect that the Debtor's net operating loss decreased from $6.4 million 2012, to $3.2 million, the decrease was due to the reduction in shareholder salaries *not* because of an increase in revenues.    In fact, in 2013, the Debtor's income before shareholder salaries was approximately $5.5 million, significantly down from $7.8 million in 2012.

45.    Pursuant to the Debtor's books and records, as of September 30, 2014, the Debtor had assets with an aggregate cash (book) value of $15,330,899, inclusive of goodwill and depreciated assets, and liabilities in the aggregate amount of $17,380,497.  Because the Debtor's liabilities exceeded its assets by over $2,000,000 on September 30, 2014, the Debtor was unable to make the redemption payments due to Former Shareholders on October 1, 2014. As of September 30, 2014, approximately $6.8 million was due to the Former Shareholders on account of redemption payments.[11]

46.    Notwithstanding the Debtor's restructuring efforts and successful reduction of expenses from 2012 to 2013, as of September 30, 2014, approximately 43% of the Debtor's accounts payable were at least sixty-one (61) days past due.

### Mass Exodus of Shareholders & Unfunded Redemption Liabilities

47.    The Shareholders Agreement provides that upon ninety (90) days written notice

---

[11] On September 30, 2014, prior to re-calculating the value of the Debtor's shares as required by the various redemption agreements entered into with the Former Shareholders, the Debtor's books and records reflected that approximately $7.9 million was due to Former Shareholders on account of redemption payments.  The decrease in share value caused a decrease in the aggregate amount due to Former Shareholders for redemption payments, but did not change the Debtor's inability to make the monthly shareholder redemption payments.

SPG/1762220.5/063017

to the Debtor, a shareholder can offer to sell his or her shares back to the Debtor.  That shareholder is then deemed to have resigned from his or her employment from the Debtor.  The Debtor and the former shareholder then enter into a redemption agreement for the redemption of his or her shares over time, and the Debtor grants that redeeming shareholder a promissory note in the amount of the value of the redeemed shares payable over sixty (60) months.

48.    The Debtor is currently owned by eight (8) physicians who comprise the Current Shareholders.  Ten (10) of the Debtor's shareholders entered into shareholder redemption agreements effective in 2013, and seven (7) of the Debtor's shareholders entered into shareholder redemption agreements effective in 2014 (collectively, together with another shareholder who redeemed prior to 2012, the "**Former Shareholders**").

49.    The sudden and drastic decrease of shareholders over the last few years was caused by the unwillingness of some Former Shareholders to provide personal guarantees to refinance the Debtor's secured liabilities, and need to implement cost-cutting measures, including the reduction of physician salaries.

50.    In addition, in 2013, a resolution was passed by the shareholders reducing salaries of physician employees (including shareholders) to cut expenses.  Certain Former Shareholders believed that the basis and result of that resolution were unfair and, as a result, commenced an action against the Debtor and the members of its Board, in the Supreme Court of the State of New York, Nassau County (Driscoll, J.), titled *David M. Kaplan, M.D., Alice Kim, M.D., Stephanie Sims, M.D., Nina S. Vincoff, M.D. v. NRAD Medical Associates, P.C., et al.,* Index No. 13006/12, seeking to nullify that shareholder resolution.  The Debtor reached a settlement with the remaining plaintiffs in that action.

51.    Despite the Debtor's efforts to reduce expenses, as a direct result of litigation commenced by the Former Shareholders, the Debtor incurred legal fees and costs in excess of 200% of its budgeted amount.

SPG/1762220.5/063017

### The Debtor's Unfunded Redemption Liability

52.    As stated above, pursuant to the Shareholders' Agreement each Former Shareholder entered into a certain Redemption Agreement (collectively, the "**Redemption Agreements**") with the Debtor, and the Debtor issued each Former Shareholder a promissory note (collectively, the "**Redemption Notes**") in connection with each Former Shareholder's Redemption Agreement.

53.    Pursuant to the Debtor's books and records, in 2013, the Debtor paid approximately $1.4 million to Former Shareholders on account of the Redemption Notes. The Debtor ceased all payments to Former Shareholders on account of the Redemption Notes in October 2014.  Pursuant to projections created from the Debtor's books and records, if the Debtor had made all of the payments due to Former Shareholders under the Redemption Notes in 2014, the Debtor would have paid approximately $2.4 million (inclusive of interest).  Pursuant to those same projections, the Debtor estimates that by December 31, 2015, if the Debtor made the redemption payments due to Former Shareholders in 2015, it would have paid an additional $2.237 million in redemption payments (inclusive of interest) to Former Shareholders.  As of the Petition Date, the total amount that remains due to the Former Shareholders under the Redemption Notes is approximately $6.8 million.

54.    In addition to redemption payments, upon termination of their employment, Former Shareholders that were no longer employees of the Debtor triggered severance obligations for the Debtor.[12]

55.    In 2014, the Debtor made severance payments in the amount of $583,000 to Former Shareholders who are no longer employees.  The Debtor estimates that in 2015,

---

[12] Each shareholder of the Debtor enters into an Employment Agreement with the Debtor. Pursuant to the Shareholders' Agreement, upon a shareholder's redemption of his or her shares, he or she cannot continue to be employed by the Debtor.  The Debtor made certain exceptions with respect to the Former Shareholders, some of whom continued to be employed by the Debtor after redeeming his or her shares. The Employment Agreements provided that if a physician employee voluntarily terminates his or her employment with the Debtor, then he or she is entitled to severance payments calculated pursuant to a formula based on his or her contracted for salary.

SPG/1762220.5/063017

those Former Shareholders who are no longer employees would have received severance payments in the amount of $623,824. As of the Petition Date, the total amount that remains due to the Former Shareholders for severance obligations is approximately $2.8 million.

### Shareholder Litigation

56.   As set forth on Exhibit A annexed hereto, and below, the Debtor is a party to several pending litigations which, in addition to the actions described below, also significantly increased the Debtor's legal expenses, and distracted the Current Shareholders and management from operating the Debtor's business. The actions referenced and explained below pertain to the Debtor's litigation with its Former Shareholders caused by the Debtor's inability to make certain payments due under the Redemption Notes pursuant to the Redemption Agreements.

57.   Unfortunately, despite the Current Shareholders' willingness to accept salary reductions and even work without compensation for weeks at a time, the Debtor was unable to continue business operations and satisfy its legacy debt due to the Former Shareholders.

### The BCL Action

58.   On November 12, 2014, the Debtor commenced an action in the Supreme Court, Nassau County (Driscoll, J.) titled *NRAD Medical Associates, P.C. v. David Ebling, M.D., et al.,* under Index No. 606028/14 (the "**BCL Action**"), seeking entry of a declaratory judgment pursuant to CPLR §3301 and N.Y. Business Corporations Law ("**BCL**") holding that the Debtor does not have sufficient "surplus" to make redemption payments due to the Former Shareholders, and is insolvent, or would be rendered insolvent, if required to make such redemption payments.[13] The concept is that a company's former shareholders should not take

---

[13] BCL §513 provides that notwithstanding any authority in the certificate of incorporation, a company may only make payments to redeem shares from "surplus," and may not redeem its shares in exchange for cash if the company is equitably insolvent or will be rendered insolvent by the redemption. *See* BCL §513(a). As alleged in the BCL Action, BCL §513 prevents companies that cannot pay their debts as they become due, from using available funds to make shareholder redemption payments. Moreover, a company's directors may be jointly and severally liable with the company to shareholders and creditors

SPG/1762220.5/063017

priority over a company's creditors that extend credit in good faith, without knowledge of such redemption obligations.

59.    The Debtor commenced the BCL Action after careful consideration and deliberation amongst the Current Shareholders and the Debtor's retained professionals regarding the Debtor's lack of "surplus."    The Debtor recognized that (i) it was unable to continue making payments due to the Former Shareholders under the Redemption Agreements and Redemption Notes, (ii) continuing to make such payments in its financial state would be a violation of BCL §513, and (iii) each of the Former Shareholders would likely take legal action to recover amounts owed.

60.    Thus, rather than waiting and defending eighteen (18) identical litigations, the Debtor commenced the BCL Action to have the issue affecting all Former Shareholders determined in one forum, simultaneously.

### Vincoff Litigation I

61.    On November 5, 2014, seven (7) days before the Debtor commenced the BCL Action, Nina S. Vincoff, M.D. ("**Vincoff**"), one of the Former Shareholders, commenced an action in the Supreme Court, Nassau County (Distefano, J.) (the "**Nassau State Court**") titled *Nina S. Vincoff v. NRAD Medical Associates, P.C.,* under Index No. 605872/2014 ("**Vincoff I**") by filing a motion for summary judgment in lieu of a complaint, seeking entry of a judgment for the full amount due under her Redemption Note pursuant to her Redemption Agreement.

62.    Specifically, Vincoff argued that the Debtor defaulted under her Redemption Note and, therefore, regardless of BCL §513, and the fact that seventeen (17) other Former Shareholders were in the same position, she was entitled to a judgment for the full amount owed.

63.    On February 9, 2015, notwithstanding the Debtor's opposition and cross motion to dismiss, or in the alternative stay or consolidate Vincoff I with the BCL Action, the Nassau

---

for violations of BCL §513.

State Court entered an order granting Vincoff's motion for summary judgment pursuant to CPLR 3213, and directing entry of a judgment in the amount of $318,994.09.

64.    On April 10, 2015, the Debtor and Vincoff entered into a Security Agreement (the "**Vincoff Security Agreement**") pursuant to which the Debtor granted Vincoff a security interest and lien, subordinate to all prior liens, upon substantially all of the Debtor's assets up to the amount of $318,994.09, plus interest, costs, and fees (including reasonable attorney's fees) that continue to accrue pursuant to the judgment entered in Vincoff I (the "**Vincoff Lien**").   On May 1, 2015, Vincoff filed a UCC-1 financing statement against the Debtor perfecting her security interest granted under the Vincoff Security Agreement.

65.    On May 5, 2015, a judgment (the "**Judgment**") was entered in the office of the Clerk of the Nassau State Court, and on June 1, 2015, the Debtor filed and served a Notice of Entry of the Judgment.   The Debtor appealed the Judgment.

66.    The Debtor intends to commence an adversary proceeding against Vincoff in the next few days (the "**Vincoff Adversary Proceeding**") to, among other things, avoid the granting and perfection of her security interest, as a preferential transfer made by the Debtor within the ninety (90) days prior to the Petition Date pursuant to Bankruptcy Code §547.

### Weber Litigation

67.    On November 13, 2014, one (1) day after the Debtor commenced the BCL Action, Pamela Weber, M.D. ("**Weber**"), one of the Former Shareholders, filed a summons and complaint against Dr. Lang and the Debtor in the Supreme Court of the State of New York, County of Westchester (the "**Westchester State Court**") titled *Pamela Weber v. NRAD Medical Associates, P.C. and Paul Lang,* under Index No. 69720/2014 (the "**Weber Action**") to recover the payments due under her Redemption Note pursuant to her Redemption Agreement.[14]

---

[14] Dr. Lang signed Weber's Redemption Note and Redemption Agreement solely in his capacity as President of the Debtor, and provided no other writing or oral confirmation that he intended to guaranty

68.    The Debtor and Dr. Lang filed a motion to dismiss Weber's complaint, to which Weber responded with a procedurally improper motion for summary judgment.  Weber filed an opposition, to which the Debtor filed a reply.   The parties are awaiting a decision from the Westchester State Court.

### Feld Arbitration

69.    On March 9, 2015 Leslie J. Feld, M.D. ("**Feld**"), one of the Former Shareholders, filed a Demand for Arbitration with the American Arbitration Association against the Debtor, Daniel Benjamin, M.D., Paul Cayea, M.D., Paul S. Lang, M.D., Jay L. Bosworth, M.D. and Geraldine McGinty, M.D., under Case Number 01-15-0002-3482 (the "**Feld Arbitration**").  In the Feld Arbitration, Feld seeks an award aggregating approximately $1 million pursuant to claims for salary increases, benefits, severance payments, reimbursement for expenses and payments she made to purchase shares in the Debtor.  A timetable for discovery and hearings is scheduled to be adopted at a status conference set for July 30, 2015.

### Vincoff Litigation II

70.    On June 16, 2015, Vincoff commenced an action against Meridian, Blue Dot, and the Debtor in the Nassau State Court titled *Nina Vincoff, M.D. v. Meridian Imaging Group, LLC, Blue Dot Holdings, LLC and NRAD Medical Associates, P.C.,* under Index No. 603887/2015 ("**Vincoff II**"), (i) bringing a claim for replevin against Meridian to seize the transferred collateral in the Alignment Transaction for the purpose of selling it to satisfy the obligations secured by her subordinate security interest, (ii) seeking a declaratory judgment against Meridian, Blue Dot, and the Debtor that BCL §513 does not prevent her from enforcing her security interest in the transferred collateral, (iii) asserting claims against the Debtor for breach of the stipulation and the Vincoff Security Agreement, and (iv) as an alternative to her claim for replevin, seeking to set aside the transfer from the Debtor to Blue Dot to Meridian,

---

the Debtor's obligations to Weber.  The continued prosecution of the Weber Action is likely to create an indemnification claim against the Debtor by Dr. Lang.

subject to the Vincoff Lien, as an fraudulent conveyance and to recover money damages.

71.   Prior to commencing *Vincoff II*, prior to consummating the Alignment Transaction, and pursuant to the Vincoff Security Agreement, the Debtor advised Vincoff of its intent to consummate the Alignment Transaction, that the transfer of the Imaging Assets was subject to the Vincoff Lien, and that the Debtor intended to provide Vincoff with replacement liens.   The Debtor also entered into a Confidentiality Agreement with Vincoff pursuant to which the Debtor provided Vincoff with certain Alignment Transaction documents, which were meant to provide Vincoff comfort that she was not harmed or prejudiced in any way by the Alignment Transaction, remained adequately protected, and to demonstrate that the Alignment Transaction was consummated to create a revenue stream with which the Debtor might satisfy outstanding liabilities, including the Vincoff Lien.   Notwithstanding those facts, Vincoff unreasonably objected to the Alignment Transaction.

72.   In response to the news that the Alignment Transaction closed, Vincoff filed UCC-1 financing statements against Meridian and Blue Dot, which were subsequently amended because her collateral descriptions were vague and overreaching.   Vincoff also sent letters to Meridian, Blue Dot, Affiliated, and the Debtor attempting to disrupt the Alignment Transaction and asserting, among other things, that despite the fact that she is a junior secured creditor, she is entitled to foreclose upon the assets transferred by the Debtor to Blue Dot to Meridian, and that those assets should be assembled for her to collect and to sell to satisfy the Vincoff Lien.   Notably, Vincoff did not include Sterling or the Current Shareholders, both senior secured creditors, in her correspondence or as parties in *Vincoff II*.

73.   Recognizing that by filing the complaint with the Nassau State Court, Vincoff would be in violation of both her stipulation with the Debtor, as well as her Confidentiality Agreement, Vincoff agreed to file only the summons and serve the complaint against the parties.

74.   Meridian, Blue Dot, and the Debtor filed a motion to dismiss *Vincoff II*.   In

addition, as stated above, it is the Debtor's position that Vincoff is not a secured creditor because the granting and perfection of her security interest were preferential transfers. Accordingly, as part of the Vincoff Adversary Proceeding, the Debtor also intends to seek a temporary restraining order preventing Vincoff from further disrupting the Alignment Transaction.

### Efforts to Right-Size the Debtor's Practices and Explore Other Opportunities

75.    Prior to my retention, and in the midst of ongoing litigation, the Debtor implemented various plans to right-size its Imaging Practice, RT Practice, and MSP Practice, reduce expenses, and explore potential alignment or merger opportunities which would enable the Debtor to satisfy its accounts payable and the Sterling Debt.  The Debtor entered into discussions and negotiations with alternative healthcare entities, private merchant bankers, and other hospitals, but was unable to progress beyond initial discussions and term sheets with any of those parties.

76.    In January 2014, I was retained by the Debtor to analyze its financial issues and determine whether a restructuring might be possible or the Debtor either on its own, or by way of a purchase or alignment.  After reviewing the Debtor's books and records, I determined that there was significant value in the Imaging Practice which, if properly reduced, might be realized, but that the RT Practice and MSP Practice needed to be reduced and if not otherwise sold, ultimately shut down.

77.    One of the Debtor's largest liabilities behind Sterling and professional fees was landlord arrears in connection with one of the Debtor's most valuable assets: the Imaging Practice site locations.  Prior to June 1, 2015, the Debtor owed approximately $1 million to landlords of its Imaging Practice sites.  As part of the Alignment Transaction, the Debtor agreed to assign its various leases to Blue Dot, and that Blue Dot would then assign those leases, all subject to the landlords' consents, to Meridian, which would then license the ability to utilize those sites to NYU.  To that end, the Debtor and its professionals expended

significant resources negotiating with the Debtor's landlords to attempt to negotiate acceptable assignments, as required by the Alignment Transaction.

78.    As of the Petition Date and notwithstanding the Debtor's best efforts to the contrary, the Debtor was unable to negotiate consents to assignment of most its lease agreements.  The Debtor's failure to obtain consents to assignment of its lease agreements was due in part to the outstanding arrears.  In an effort to alleviate some of the pressures asserted by the Debtor's landlords, as part of the Alignment Transaction, NYU advanced approximately $650,000 to the Debtor, which remitted those funds to certain landlords.[15]

79.    The Debtor intends, through this chapter 11 case, to cure the various arrears and move to assume and assign the lease agreements for the various Imaging Practice sites, as contemplated by the Alignment Transaction.  The Debtor does not anticipate that its landlords will object to assumption and assignment of their lease agreements because the Debtor intends to cure the arrears due, and Meridian is an operating entity with a reliable revenue source.

### The Financial Drain of the RT Practice and MSP Practice

80.    Since at least January 2014, the RT Practice and MSP Practice have been, and continue to be, a significant financial burden.  Initially, the Debtor believed that there would be economic advantages to the continued operations of the RT Practice and MSP Practice.  Upon closer review, it became clear that operating expenses exceeded any economic benefits.

81.    As a result, and as stated above, over the last few months the Debtor provided notice to certain MSP physicians of its intent to unwind their MSP Agreements, and assisted those MSP physicians to locate alternate practices or hospitals, including NYU.  The

---

[15] The obligations due to NYU for funds advanced to satisfy the Debtor's rent arrears will be satisfied via reductions to the distribution paid to Meridian pursuant to that certain Exclusive License Agreement, and those amounts will be repaid to Meridian by Blue Dot over a six (6) month period in equal monthly installments from proceeds otherwise payable to Blue Dot.

SPG/1762220.5/063017

remaining MSP Agreements are expected to unwind by September 1, 2015, at which time the Debtor will have no further obligations to those MSP's or their employees.

82.    The Debtor was unable to simply cease all business operations of either the MSP Practice or RT Practice because (i) the Debtor is a party to MSP Agreements which contain certain limiting provisions, and (ii) according to the RT Practice physicians, the RT Practice machines are calibrated to individual treatment plans for cancer patients which cannot be interrupted.

83.    With respect to unwinding the RT Practice, the Debtor believed that there was value in the business, and attempted to negotiate alignment transactions with, or sales to, various healthcare entities and hospitals, including NYU.  Unfortunately, the Debtor was unable to negotiate an alignment for the RT Practice with NYU or any other provider.  As a result, the Debtor began the process of winding down the RT Practice by consolidating equipment, personnel, and patients to one (1) facility (from three (3) operating sites), to the extent it was reasonably safe to do so.[16]  Unless a potential purchaser is located in the next few weeks, the Debtor intends to complete treatment plans for existing patients, stop accepting new patients, wind down business operations, and liquidate any remaining assets of the RT Practice for the benefit of the Debtor's creditors.

84.    Unfortunately in the midst of the Debtor's efforts to wind down the RT Practice, the Debtor was named as a defendant in two (2) actions by equipment lessors to recover valuable equipment and/or money damages in excess of $1.5 million.  Specifically, the Debtor is the defendant in the following actions (together, the "**RT Actions**"): (i) an action titled *Manufacturers and Traders Trust Company v. NRAD Medical Associates, P.C.,* under Index No. 4137/2015 pending in Nassau State Court, in which the plaintiff is seeking, among other things, an order of replevin for a tomotherapy machine utilized in the RT Practice and money damages; and (ii) an action titled *Bank of the West v. NRAD Medical Associates, P.C.,* under

---

[16] The Debtor is mindful of its ethical obligations to its patients in that regard, and will proceed accordingly.

Case No. 15-cv-2161 (JMA) (ARL) pending in the United States District Court for the Eastern District of New York, in which the plaintiff is seeking money damages with respect to various pieces of equipment utilized in the RT Practice.   The RT Actions are stayed by the commencement of this chapter 11 case.

85.   The Debtor intends to conduct an orderly wind down of the RT Practice pursuant to which it will attempt to negotiate a sale of the RT Practice to potential purchasers, or reject the various lease agreements for the RT Practice sites, return equipment to the respective lessors, and liquidate the remaining equipment for the benefit of creditors.

### The Current Shareholders

86.   As discussed herein, the Current Shareholders stayed the course and attempted to restructure the Debtor's business and create value for the benefit of the Debtor's creditors by: (i) providing Personal Guarantees to Sterling when the Former Shareholders redeemed their shares and found new jobs; (ii) pledging $2 million of their own cash and securities as additional collateral for the Sterling 2013 Term Loan and Sterling 2013 Credit Facility, and executing Certifications in June 2015 allowing Sterling to continue to hold the Shareholders' Additional Collateral and affirming the Personal Guaranties; (iii) agreeing to further reduce salaries and work some weeks without compensation to ensure uninterrupted business operations for the Debtor's various practices;[17] (iv) negotiating the Alignment Transaction which provides a future revenue stream for the Debtor's creditors; and (v) resolving to commence this chapter 11 case so that the Debtor's assets are drawn upon for the benefit of all creditors rather than the select few that pursued legal action.

### The Debtor's Chapter 11 Case

87.   The Debtor has determined that it is in the best interest of its creditors to file this chapter 11 case in order to collect pre Alignment Transaction receivables, stay the various litigations, allow the post-closing details of the Alignment Transaction to be negotiated without

---

[17] The Current Shareholders are owed in excess of $800,000 for accrued unpaid compensation.

disruption (creating a revenue stream for the Debtor's creditors), potentially negotiate a sale of the RT Practice, successfully unwind the remaining MSP Agreements under the MSP Practice, and propose a chapter 11 plan which maximizes the value of the Debtor's estate for the benefit of all of the Debtor's creditors, rather than a select few.

88.    In the beginning months of the chapter 11 case, the Debtor will continue its efforts to wind down the RT Practice to the extent it is safe to do so.  The Debtor estimates that by the end of August 2015, it will no longer need to operate the RT Practice, and can begin liquidating available assets.   The Debtor will also continue its efforts to wind down the MSP Practice.  The Debtor estimates that by September 1, 2015, the notice periods required under the MSP Agreements to unwind the MSP Practice will have expired, and the Debtor will have no further obligations with respect to the MSP Practice.

89.    The Debtor also expects that within the next few months, any remaining medical staff, including nurses, providing services to NYU's patients under the Alignment Transaction will be employed by a newly formed professional corporation.  It is my understanding that certain medical staff cannot be employed by Meridian directly, because it is an MSO and, therefore, a professional corporation needed to be formed, and physicians need to be credentialed to that new entity, which are time consuming processes.

90.    The Debtor intends to file a plan of reorganization that will likely provide for the creation of a liquidating trust for the benefit of the Debtor's creditors.  The Debtor's plan will provide for payments to creditors over an agreed upon period of time from the trust, funded by the Debtor's collection of pre Alignment Transaction receivables, as well as the income stream due from Meridian pursuant to the Alignment Transaction.  The Current Shareholders hope to continue their ownership of the Debtor and management of the Debtor's subsidiary Blue Dot. The Current Shareholders are personal guarantors of the Sterling Debt, continue to pledge the Shareholders' Additional Collateral ($2 million of their own personal funds) and, as employees of NYU, create patient volume and increase the fees due to Meridian from NYU which will be

SPG/1762220.5/063017

used to fund distributions to creditors.  In addition, certain Current Shareholders accepted employment with NYU at further reduced salaries so that the Alignment Transaction could close on or before June 1, 2015.

91.    The creditors' trust may also be funded with the proceeds of litigation to be commenced against the Former Shareholders, including the Vincoff Adversary Proceeding, to avoid and recover transfers made to the Former Shareholders over the last few years.

92.    As stated above, the Debtor also intends, though the Vincoff Adversary Proceeding, to avoid the Vincoff Lien.  The Debtor attempted to settle with Vincoff prior to her efforts to disrupt the Alignment Transaction, but was unable to do so.  I believe that she will continue to attempt to disrupt Meridian's business operations without regard for the hundreds of jobs or the income stream that will fund creditor distributions she is putting at risk.  In addition, I believe that Vincoff and her attorneys are seeking an unreasonable amount of damages and legal fees that she is not otherwise entitled to, and cannot be satisfied from the Debtor's assets. Accordingly, the only rational way to proceed is to commence the Vincoff Adversary Proceeding, and to avoid the Vincoff Lien as a preferential transfer.

93.    Indeed, *Vincoff II* poses an immediate threat to the Debtor's ability to maximize value in connection with its chapter 11 plan to the extent that Vincoff attempts to disrupt Meridian's business operations and causes Meridian to incur excessive legal fees, which the Debtor is obligated to pay.  Because the commencement of this chapter 11 case does not automatically stay *Vincoff II* as against Meridian and Blue Dot, there is a significant risk that protracted litigation and attendant distraction could derail the Alignment Transaction and the successful resolution of this chapter 11 case.  Therefore, a temporary restraining order as against Vincoff is appropriate.

**The First Day Motions**

94.    On the Petition Date, the Debtor filed certain "First Day" motions seeking emergency relief.  As set forth below, I believe that obtaining the relief requested in each of

SPG/1762220.5/063017

the First Day motions is critical to avoid irreparable harm to the Debtor, its business, and its prospects for maximizing the value of its business as a going concern.

**Application to Pay Certain Pre-Petition Date Wages,**
**Salaries, and Related Employee Benefits, and**
**Directing the Bank to Honor Employee Wage, Salary**

95.    The application seeking authority to pay certain pre-Petition Date wages, salaries, and related benefits is critical because the Debtor's employees may stop working if they are not timely paid. The application seeks to pay employees' accrued and unpaid pre Petition Date wages, salaries, and related benefits, for the period June 21, 2015 through and including July 4, 2015 (which, subject to Court approval, will be paid to employees July 10, 2015), and July 5, 2015 through July 7, 2015 (which, subject to Court approval, will be paid to employees July 24, 2015), in amounts which do not exceed the priority limits set forth in Bankruptcy Code § 507(a)(4).[18]   In addition, the application seeks entry of an order directing the Debtor's payroll and human resources administrator, or its bank, to honor employee wage and checks, drawn on the Debtor's payroll account.

96.    I believe that there are strong and cogent reasons why the relief requested ought to be granted.   In particular, in order for the Debtor to successfully recover all accounts receivable, fulfill its obligations under the Alignment Transaction (which creates a revenue stream for the benefit of the Debtor's creditors), honor its contractual obligations under the MSP Practice, as well as its ethical obligations to existing cancer patients as part of the RT Practice, it must have the authority to honor its obligations to its employees in the ordinary course of business.

97.    Without such relief requested, the Debtor's employees would suffer a tremendous hardship. It is respectfully submitted that any delay in paying the employees'

---

[18] As set forth in the Debtor's application, there are some physicians owed accrued unpaid compensation in excess of the statutory limit. Those physicians are not insiders, and the Debtor is seeking authority to pay those amounts because the physicians are essential to the Debtor's continued business operations and service of its current remaining patients.

SPG/1762220.5/063017

compensation will severely disrupt the Debtor's relationship with its employees, and irreparably harm and/or impair their morale at a time when their dedication, confidence and cooperation is critical.

98.    In addition, the prompt payment of wages to the Debtor's employees is necessary to avoid causing personal hardships to those individuals and their families.

**Motion to Continue to Use Existing
Cash Management System and Maintain
Existing Bank Accounts and Business Forms**

99.    The motion seeking authority to continue using the Debtor's pre-Petition Date cash management system and to maintain its existing pre-Petition Date bank accounts and business forms is critical to ensure the Debtor's compliance with certain guidelines promulgated by the Office of the United States Trustee, without disrupting the Debtor's business operations, and jeopardizing the Debtor's chance for success in this chapter 11 case.  I understand that the Office of the U.S. Trustee issued guidelines for debtors in chapter 11 which, among other things, would require the Debtor to close its existing bank accounts, open new accounts and immediately obtain new checks with a "Debtor in Possession" designation on them.

100.  The Debtor maintains eight (8) bank accounts with three different banks: Sterling; Valley National Bank; and Signature Bank.  Although payments received in connection with the Alignment Transaction will be relatively straightforward and can be directed to specific accounts fairly easily, the Debtor's other current revenue sources are more complicated because they involve Medicare, Medicaid, and various third-party payor and insurance companies.  If the Debtor is required to strictly comply with those U.S. Trustee guidelines, its continued operations in chapter 11 will be negatively impacted by the disruption, confusion, and delay that would most certainly result.

101.  The relief requested in the Debtor's motion will also spare the Debtor the interruption in collecting its receivables, and reduce expenses as collections will be delayed if

SPG/1762220.5/063017

the Debtor's payors are required to change the payment information in their remittances.  The Debtor's bank accounts are located at Sterling, Valley National Bank, and Signature Bank. Sterling and Signature are approved depositories under the Guidelines for Region 2 of the United States Trustee's Office, Eastern District of New York, Brooklyn and Central Islip. Although Valley National Bank is not an approved depository in this District, I am informed that it is an approved depository in the Southern District of New York.  In addition, the Debtor will provide sufficiently detailed reports to the Office of the U.S. Trustee regarding those funds.

**Application to Authorize**
**The Debtor To Use Cash Collateral**

102.  The application seeking authority to use cash collateral is essential to the Debtor's continued operation of its business.  As described above, the Debtor continues to employ various cardiologists and nurses and, although the Debtor is eventually reimbursed by NYU for those services, the Debtor must first pay those individuals.  In addition, the Debtor continues to collect pre Alignment Transaction receivables, which requires the Debtor to continue paying its administrative staff and billers as well as MMP to the extent it is obligated to provide services to the Debtor over the next few months.  The Debtor also requires the use of cash collateral to pay operating expenses of its RT Practice and MSP Practice, until the Debtor successfully winds them down.

103.  Sterling is fully secured by the collateral for the Sterling Debt which, as of July 1, 2015, has an aggregate book value of approximately $7 million plus the Debtor's interests in Blue Dot, and income stream due from Meridian scheduled to begin September 2015.  In addition, as demonstrated by the 13-week cash flow projections attached to the Debtor's motion, the Debtor's revenue each month is sufficient to enable the Debtor to make monthly interest payments and a negotiated pay down of principal.  Moreover, as state above, the Current Shareholders personally guaranteed the Sterling Term Loans.  In sum, I believe that Sterling's interest is sufficiently protected by the value of its collateral and personal

guarantees. Furthermore, the Debtor understands that Sterling consents to the Debtor's continued use of cash collateral.

104. Without use of cash collateral, the Debtor cannot pay its essential employees or operating expenses necessary to the successful wind down of its RT Practice and MSP Practice, nor the essential employees necessary to collect pre Alignment Transaction receivables.  In addition, without the use of cash collateral, Debtor will not be able to satisfy its obligations under the Alignment Transaction, which creates the revenue stream necessary to partially fund its plan.  The Debtor requires use of Sterling's cash collateral in order to run day-to-day business operations, and will suffer irreparable harm if it is prevented from doing so.

**Motion Prohibiting Utilities from Altering,**
**Refusing or Discontinuing Services to, or**
**Discriminating Against the Debtor, Determining**
**that the Utilities are Adequately Assured of Future Payment,**
**Establishing Procedures for Determining Requests for Additional**
**Assurance, and Permitting Utilities to Opt-Out of Procedures**

105. The motion seeking entry of an order (a) prohibiting utility companies currently providing services, or that will provide services, to the Debtor, from altering, refusing, or discontinuing services to, or discriminating against, the Debtor on account of this chapter 11 case, (b) determining that those utility companies have received adequate assurance of payment for future utility services, (c) establishing certain procedures for determining requests for additional assurance for the utility companies, if any, and (d) permitting utilities to opt-out of procedures, is essential to the Debtor's continued operation of its business and facilities, and, therefore, its business.

106. Utility Services are essential to the Debtor's ability to sustain its operations while its chapter 11 case is pending.  The Debtor currently uses telephone and internet, electricity, natural gas, water, and sewer from a number of utilities.  Uninterrupted utility service is essential to the Debtor's ongoing operations, including the ability to service patients in imaging and radiation therapy centers, as well as MSP Practice sites.  Because the Debtor's leasehold

interests in certain of the imaging sites have not yet been assigned to Blue Dot, and then to Meridian, the Debtor's name remains on those utility accounts.   In addition, the Debtor requires electricity and telephone use to accept calls from and schedule appointments with new patients, as well as to handle issues with current vendors.   Should any utility company refuse or discontinue service, even for a brief period, the Debtor would be unable to operate its business, which would irreparably harm the Debtor's business and ability to operate as a going concern.

107.   The Debtor intends to timely pay its postpetition obligations to its various utility companies, as it has always done prior to the Petition Date, from available cash.

**Information Required By Local Rule 1007-4**

108.   It is my understanding that Local Rule 1007-4 requires the Debtor to disclose certain information relating to the Debtor's assets, liabilities and financial condition. That information is set forth in **Exhibit A** annexed hereto.

## **CONCLUSION**

109. I believe that under the protection of this Court, the Debtor will be able to maximize the value of its business and assets for the benefit of creditors and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 6, 2015

_/s/ Nat Wasserstein_
Nat Wasserstein

SPG/1762220.5/063017